**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | |
|---|---|
| TRACY CAMPOFREDANO, | ) CASE NO. 1:21-CV-00806-CEH |
| Plaintiff, | ) |
| | ) MAGISTRATE JUDGE |
| v. | ) CARMEN E. HENDERSON |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| | ) **MEMORANDUM OPINION AND** |
| | ) **ORDER** |
| Defendant, | ) |

**I.    Introduction**

Plaintiff, Tracy Campofredano ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 9). Because the ALJ followed the proper procedures and his findings are supported by substantial evidence, the Court AFFIRMS the Commissioner's final decision denying Claimant SSI and DIB.

**II.   Procedural History**

On January 10, 2019, Claimant filed applications for DIB and SSI, alleging a disability onset date of October 25, 2015.[1] (ECF No. 8, PageID #: 245–47). The applications were denied

---

[1] Claimant filed previous claims for DIB and SSI that were denied on August 11, 2016. (ECF No. 8, PageID #: 67). The ALJ found no grounds for reopening the application and determined that Claimant's earliest possible onset date is August 12, 2016. (ECF No. 8, PageID #: 67).

1

initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 8, PageID #: 193). On April 8, 2020, an ALJ held a telephone hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 8, PageID #: 88). On June 3, 2020, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 8, PageID #: 13). The ALJ's decision became final on February 18, 2021, when the Appeals Council declined further review. (ECF No. 8, PageID #: 56).

On April 15, 2021, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 11, 12). Claimant asserts the following assignment of error:

> Whether the Administrative Law Judge's decision that Plaintiff can perform her past relevant work is supported by substantial evidence when he did not properly consider the opinion of the treating source

(ECF No. 11 at 1).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> At [the] hearing, the claimant testified that she is unable to work due to arthritis in her back, shoulders and wrists, in addition to her mental health problems. She testified that she treats with a rheumatologist three times a year and takes medication for these conditions. The claimant testified that she has heartburn from her arthritis medicine and takes medicine for the heartburn. The claimant testified that she is able to stand for 30 minutes, sit for 30 minutes, and walk for no more than 10 minutes. The claimant is able to sit 20-30 minutes before needing to walk around or lay down. She is limited to lifting a milk jug. The claimant testified that she has difficulty reaching overhead. If it is cold and rainy, she stated that she is in bed until it warms up outside. The claimant further testified that she has difficulty gripping, specifically stating

2

> that her left thumb lets go. She is right handed and has less problems with her right hand. She has a service dog that helps pull her up the stairs and helps keep her from falling. She testified that she used to enjoy several hobbies that she no longer is able to do, and that her son and husband do most of the household chores. While watching television, she gets up and moves around every other commercial break.
>
> The claimant further testified that she takes mental health medications; both the dose and medication were changed approximately eight months ago. Her antidepressant makes her edgy and irritable. She also attends counseling and meets regularly with a provider to manage her mental health medications. The service dog helps with her mental impairments as well. The claimant testified that she is dyslexic and sometimes verbal instructions do not make sense to her and she needs instructions written down. She stated she could read but is unable to write because she has difficulty spelling. This creates a problem with any cashier position as she has difficulty counting change. The claimant testified that she sometimes has problems getting along with people on the job due to her mental health impairments. She stated she becomes easily irritated. She frequently has outbursts and has been talked to about her attitude on the job but has never lost a job due to this. The claimant further testified that she has difficulty focusing and has a short attention span. She testified that, on average, she is unable to get out of bed four to six days a month due to the combination of her physical and mental health impairments (Hrg. Tr.).

(ECF No. 8, PageID #: 75).

### B. Relevant Medical Evidence[2]

The ALJ also summarized Claimant's health records and symptoms:

> With respect to her mental health, the record shows that the claimant sought mental health services in July 2016 and began counseling shortly thereafter (Ex. 3F, p. 41). In September 2016, she reported that previous financial and housing issues had been resolved and, although she did not have a reason to be unhappy, she had become more depressed, intolerant and impatient with people. She described several events that triggered her anger, how

---

[2] As Claimant does not take issue with the ALJ's decision regarding her physical impairments, the Court focuses solely on Claimant's mental impairments.

3

she was unable to control her feelings, and either yelled at the vendor, hung up on her or smashed her phone. The claimant reported she spends a lot of time crying and becomes angry with herself. She agreed to undergo a psychiatric evaluation and attend an anger management group (Ex. 3F p. 18). The claimant was evaluated by psychiatry in November 2016. She reported crying a lot, with increased impatience and irritability and anger (Ex. 3F, p. 129). She presented to that appointment appropriately dressed with good hygiene. She was cooperative and maintained good eye contact. The mental status examination showed her to be alert and focused, with a euthymic mood. Her speech was normal, thoughts organized and logical, she had good insight and only a mild impairment in memory and judgment (Ex. 3F, p. 128). The claimant was started on Lexapro (Ex. 3F, p. 130). At a follow-up with psychiatry in December 2016, the claimant stated she was doing" pretty good" and that the Lexapro was helping. The claimant reported not crying as much, denied any side effects from the medications, and stated her mood was stable and she was able to deal better with stressors and did not feel overwhelmed. She stated she felt the depression had lifted. On examination, she was alert and oriented, appropriately dressed, had good [] hygiene and maintained good eye contact. Her mental health assessment showed her mood to be euthymic and she had an appropriate affect. She was alert and focused, her speech was normal and language intact, thought processes organized and logical, and she denied any abnormal or psychotic thoughts. Her memory and judgment were intact and her insight was good. Her medication was continued (Ex. 3F, pp. 43-45). In January, the claimant reported increased situational stress due to her husband being laid off with difficulty sleeping, and she was prescribed Hydroxyzine (Ex. 3F, p. 49). Although the claimant reported some increased symptoms in April 2017, she also reported she had recently had a miscarriage and had been off her mental health medications for one month; her medications were restarted (Ex. 3F, p. 53).

In May 2017, the claimant began treating with a new therapist. The claimant presented with good hygiene. She made good eye contact but appeared angry and overwhelmed. She was depressed, angry and tearful and her speech was loud (Ex. 3F, pp. 19 & 22). The following month, the claimant reported to her therapist that she was tired of being responsible for all the household chores. Suggestions were made as to how to communicate better with her family members and to establish a chore chart (Ex. 3F, p. 26). At her next therapy session, the claimant reported she was sleeping better, and had spoken with each member of her household and that they were helping more around the house. However, she

4

shared continuing relationship issues with her parents. Nevertheless, the claimant appeared relaxed and happy, and reported that she and her husband had been given a trailer and all they needed to do was fix it up and were making plans to do so (Ex. 3F, p. 30). She returned to psychiatry in June and reported that, after resuming her medications, she was doing better (Ex. 3F, p. 61). Her dose of Hydroxyzine was reduced due to complaints of daytime sedation (Ex. 3F, p. 61). At her psychiatry visit in August 2017, the claimant reported that she would be moving by the end of the month and switching her care to another office. She reported that she was doing well on her medications, her mood had been good overall and she felt stable. The claimant also reported her anger had improved, she was sleeping well and the decrease in the Hydroxyzine resolved her daytime sedation (Ex. 3F p. 65). No changes were made in her medications (Ex. 3F, p. 65).

The claimant did not follow-up with psychiatry at the new office until January 2018, at which time she reported she ran out of her medications in December and now was hypersomulent, crying for no reason, irritable, experiencing fits of anger, and having difficulty completing her activities of daily living (Ex. 3F, p. 69). She also reported mood swings. The claimant's speech was pressured so much it was difficult to understand her. She reported moving and finding out that her dream home had termites. Nevertheless, her mental status examination showed her to be alert and oriented; she had good eye contact and was cooperative, and had normal attention and concentration. Her thought process was linear and relevant, memory and judgment were good, and insight fair. However, she was depressed and tearful, and reported hearing things when she was trying to fall asleep, but denied paranoia. A low dose of Ability was added to her treatment regimen and she was to restart Lexapro and Hydroxyzine; the claimant was also referred for counseling (Ex. 3F, p. 67-69). The following month, the claimant reported doing "100x's" better with Lexapro, able to do housework, more positive, able to sleep well and stated that her appetite was back to normal. She stated she was back to doing her crafts and looking forward to a planned move to Tennessee in May. However, the claimant reported a negative side effect from the Abilify and it was discontinued (Ex. 3F, p. 78). Thereafter, she again reported an increase in symptoms; however, this was once again when she had been without her medication for a period of time (Ex. 3F, p. 82).

In July 2018, the claimant moved back to Ashtabula and resumed services with the office there. She reported having an "I don't care attitude", irritability, low mood and isolating herself. However, she

5

denied crying spells, agitation, anger or violence (Ex. 3F, p. 86). On examination, she was alert and oriented, well groomed with fair hygiene and appropriately dressed, but malodorous. She had good eye contact, was tearful at intervals, but sat relaxed in the chair, was cooperative, pleasant and did not appear in acute distress (Ex. 3F, p. 84). Her attention and concentration were good, speech normal, thought process linear, and her memory, judgment and insight were fair. She endorsed frequent fleeting and passive suicidal ideation as to what life would be like without her (Ex. 3F, p. 85). She was tapered off Lexapro and started on Cymbalta (Ex. 3F, p. 87). In August 2018, the claimant was referred to a neurologist to rule out an organic cause of her mental health symptoms (Ex. 3F, p. 93). Thereafter, the claimant reported only mild and controllable symptoms and denied suicidal ideation; at her request, her Cymbalta dose was increased to twice a day and the claimant was encouraged to participate in mental health therapy (Ex. 3F, pp. 97-98).

The claimant was seen by neurology on August 23, 2018 for the purpose of determining if some of her mental issues may be of neurological etiology. She reported a history of depression, anxiety and anger outbursts. The claimant also reported migraines two to three days a month, with nausea, vomiting, light sensitivity and sound sensitivity. She reported using Imitrex in the past and that it helped (Ex. 1F p. 58). Her psychological examination showed her to have normal affect and no anxiety. Her neurological examination was normal; the claimant also had a normal gait and her physical examination was normal (Ex 1F, p. 59). An MRI of the brain was ordered along with laboratory studies and she was prescribed Imitrex to be used as needed (Ex. 1F, p. 60). The brain MRI was unremarkable with the exception of some hyperintensities in the white matter, which were nonspecific and felt most likely due to minimal chronic microvascular change or migraines (Ex. 1F, p. 66). There are no further follow-up records with this provider or any other neurologist and no further treatment for migraines.

In December 2018, the claimant reported increased irritability and arguing with her husband who had not been working the past two weeks. She rated her depression at a six and anxiety at a three on the ten-point scale (Ex. 3F, p. 112). A trial of Wellbutrin was added to her treatment regimen (Ex. 3F, p. 113). The following month, she reported much improvement since her last visit and her medications were continued (Ex. 3F, pp. 117-118). However, thereafter, she reported an increase in irritability and worsening mood and the dose of her Wellbutrin was increased (Ex. 3F, p.

6

> 124). The claimant was hospitalized in March 2019 for worsening depression and suicidal ideation after running out of her medication one month prior and missing her follow-up appointment with psychiatry (Exs. 9F, p. 7 & 14F p. 95). She was restarted on her medications and attended unit group therapy. At the time of discharge, the claimant denied experiencing any symptoms of major depression and her mental status examination was normal (Ex. 14F, p. 96). At her follow-up appointment with psychiatry after reestablishing her medications, she reported her mood was "pretty good", that she had only mild irritability, agitation or anger and rated her anxiety at a two on the ten-point scale (Ex. 9F, p. 7). Her Cymbalta was increased and the remainder of her medications were continued (Ex. 9F, p. 8). She continued to report mild symptoms at her follow-up visit in June 2019 and her medications were continued (Ex. 12F, pp. 146-147). The claimant did not return to psychiatry until February 2020, at which time she endorsed partial medication compliance. Nevertheless, she reported no problems with her mood and rated her depression at a six out of ten with moderate irritability. She denied agitation, anger, violence or feelings of hopelessness/helplessness/worthlessness, and rated anxiety at a six out of ten, citing stressors of her living situation and finances. The claimant continued to deny panic attacks (Ex. 12F p. 153). Her mental status examination showed her to be well groomed with fair to poor hygiene, malodorous, but appropriately dressed. She maintained good eye contact, sat relaxed in the chair and smiled at intervals; the claimant was cooperative, pleasant and in no acute distress. Her attention and concentration were good, she had normal speech, her thought process was linear and she denied abnormal or psychotic thoughts. Her memory, insight and judgment were all fair (Ex. 12F, pp. 151-152). No changes were made in her medication regimen (Ex. 12F, p. 154).

(ECF No. 8, PageID #: 76–78).

### C. Opinion Evidence at Issue

Claimant began seeing Candance Pollard-Reed, CNP, on July 17, 2018. On May 1, 2020, Ms. Pollard-Reed filled out a medical opinion form regarding Claimant's ability to do work-related activities. (ECF No. 8, PageID #: 907). She diagnosed claimant with severe and recurrent major depressive disorder and post traumatic stress disorder. (ECF No. 8, PageID #: 907). She stated that Claimant's symptoms included low mood, low energy, anhedonia, anxiety, and worry

7

with stressors. (ECF No. 8, PageID #: 907). Ms. Pollard-Reed opined that Claimant had moderate limitations in understanding, remembering, and applying information, concentrating, persisting, and maintaining pace, and adapting or management oneself. (ECF No. 8, PageID #: 907). She further opined that Claimant had a marked limitation in interacting with others. (ECF No. 8, PageID #: 907). Finally, she noted that Claimant would be off task during work 10% of the time and absent from work twice a month. (ECF No. 8, PageID #: 907).

The ALJ rejected this opinion, stating:

> This opinion is not consistent with nor supported by the record. As discussed in detail above, although there are periods of increased symptoms, generally the claimant's mental health symptoms present no more than a moderate limitation in any area of functioning. Periods of increased symptoms are directly related to times when the claimant is non-compliant with her medications. Further, the record does not support the opinion that the claimant will be off task 10% of the workday and miss two days a month due to her impairments.

(ECF No. 8, PageID #: 80).

### IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: spine disorders, sleep-related breathing disorders, migraines, unspecified bipolar and related disorder, and[] unspecified trauma and stressor related disorder. (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop,

> kneel, crouch, or crawl; occasionally reach overhead bilaterally; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can understand, remember, and carry out simple instructions in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, and the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others.

(ECF No. 8, PageID #: 70–71, 74).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

9

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

**C.     Discussion**

Claimant raises one issue on appeal. Claimant argues that the ALJ's decision that she can perform her past relevant work is not supported by substantial evidence because he did not properly consider Claimant's treating source's opinion.[3] At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating

---

[3] The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. § 404.1520c for claims filed on or after March 27, 2017, such as here.

medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404.1520c(b)(2) ("The factors of supportability [] and consistency [] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . .").

Claimant asserts that the ALJ failed to properly consider Ms. Pollard-Reed's medical opinion. In relevant part, she opined that Claimant had a marked limitation in her ability to interact with others and moderate limitations in her ability to understand remember, or apply information, in her ability to concentrate, persist or maintain pace, and in her ability to adapt or manage herself. She additionally opined that Claimant would be off task 10% of the workday and miss two days of work per month. The ALJ found that the opinion was not persuasive because it was not consistent with or supported by the record. He further explained:

> "[a]s discussed in detail above, although there are periods of increased symptoms, generally the claimant's mental health

11

> symptoms present no more than a moderate limitation in any area of functioning. Periods of increased symptoms are directly related to times when the claimant is non-compliant with her medications. Further, the record does not support the opinion that the claimant will be off task 10% of the workday and miss two days a month due to her impairments.

(ECF No. 8, PageID #: 80).

Claimant argues the ALJ did not sufficiently articulate his reasoning for rejecting this opinion. She states that the "ALJ's decision is devoid of any consideration into the factors set forth in 20 C.F.R. § 404.1520c." (ECF No. 11 at 12). The Commissioner responds that the ALJ properly considered and rejected the opinion. The Court agrees.

First, the ALJ specifically discussed the two most important factors listed in 20 C.F.R. § 404.1520c—supportability and consistency. He stated that over all the opinion was not consistent with or supported by the medical record. More specifically, he stated that Ms. Pollard-Reed's opinion on Claimant's mental functioning limitations was inconsistent with the record and her opinion that Claimant will be off task and absent was not supported by the record. This is sufficient to satisfy the articulation requirements as the ALJ was not required to discuss any other factor.[4] *See* 20 C.F.R. § 404.1520c(b)(2) (requiring only that the ALJ articulate how he considered the supportability and consistency factors).

Second, the ALJ's conclusions are supported by substantial evidence. When discussing Claimant's failure to meet a Listing, the ALJ explained in depth why he concluded that Claimant had only mild or moderate limitations in the realms of mental functioning. In contrast to Ms. Pollard-Reed, the ALJ concluded that Claimant had only a moderate limitation in interacting

---

[4] Claimant discusses how the other factors support her argument. However, because the ALJ concluded that the two most important factors did not support the opinion, even if Claimant is correct about the remaining factors, it would not make the ALJ's decision incorrect.

12

with others. He recognized that Claimant alleged difficulty getting along with others when her pain was severe. However, he stated that when Claimant is compliant with her medications, she generally reports minimal irritability and denies anger. The ALJ also reasoned that Claimant shops and spends time with friends on a weekly basis. He noted that Claimant has never lost a job because of difficulty getting along with others. This is sufficient evidence to support the ALJ's conclusion that Ms. Pollard-Reed's opinion was inconsistent with the record.

Additionally, the ALJ's conclusion that Claimant's periods of increased symptoms are directly related to times she was noncompliant with her medications is also supported by substantial evidence. In December 2016, after reporting crying a lot in November 2016, Claimant reported doing better on medication. (ECF No. 8, PageID #: 486). In April 2017, Claimant stated she had increased symptoms but had not been on her medications for a month and was just restarting them. (ECF No. 8, PageID #: 494). After resuming her medications, Claimant reported doing better in June 2017. (ECF No. 8, PageID #: 502). In August 2017, Claimant again stated she was doing well on medication and was overall stable. (ECF No. 8, PageID #: 506). In January 2018, Claimant reported that after running out of medications a month prior she had been crying a lot, was irritable, and experienced fits of anger. (ECF No. 8, PageID #: 510). The next month, Claimant announced she was doing "100x's" better on her medication. (ECF No. 8, PageID #: 519). These are just some of the examples of Claimant's increased symptoms during times of medication noncompliance that the ALJ discussed. (ECF No. 8, PageID #: 76–78). The Court concludes that this is more than enough evidence to support his conclusion.

Finally, the ALJ's conclusion that the entire check box opinion was not supported by the record is supported by substantial evidence. Courts throughout the Sixth Circuit have concluded that check-box opinions are unsupported and a reason to discount a medical opinion. *See Marks*

*v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 WL 1801609, at *8 (N.D. Ohio Jan 12, 2018) ("Numerous decisions have found that the use of checklist or check-the-box forms in which the doctor provides little or no accompanying explanation for the assessed limitations . . . are unsupported and, therefore, the ALJ may properly discount the treating source opinions." (citing *Kepke v. Comm'r of Soc. Sec.*, F. App'x 625, 630 (6th Cir. 2016))); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (stating that check-box opinions are "weak evidence at best" (citations omitted)). This is true "even when the ALJ did not specifically call attention to it in the decision." *Marks*, 2018 WL 1801609, at *8. The Sixth Circuit Court of Appeals concluded that an ALJ's failure to provide good reasons for discounting a treating source's check-box opinion is harmless error. *Hernandez*, 644 F. App'x 468, 474–75; *see also Marks*, 2018 WL 1801609, at *8 ("Other courts have concluded the same, noting that 'even if the ALJ failed to provide good reasons' for assigning little weight to a treating source's opinion, such error was harmless where the opinion consisted of a check-box worksheet lacking any explanation beyond a diagnosis." (citations omitted)). Here, although the ALJ did not explicitly state that he discounted Ms. Pollard-Reed's opinion because of its check-box form, his failure to do so was harmless because it is clearly established that such opinions are not supported by the evidence. The Court, therefore, finds that the ALJ properly determined that Ms. Pollard-Reed's opinion lacked supportability.

While Claimant points to certain parts of the record that support her argument, "a claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [Claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Claimant did not

14

meet this burden and, as discussed above, the Court concludes there is substantial evidence to support the ALJ's decision. Because the ALJ properly articulated his reasoning and it was supported by substantial evidence, the Court finds no reason to disturb the ALJ's decision. Accordingly, Claimant's assignment of error is without merit.

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner's decision denying Claimant Social Security Income and Disability Insurance Benefits.

**IT IS SO ORDERED.**

Dated: January 18, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

_____

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).